SENATE SELECT COMMITTEE ON PRESIDENTIAL CAMPAIGN ACTIVITIES, suing in its own name and in the name of the United States, et al., Appellants,

v.

Richard M. NIXON, Individually and as President of the United States.

No. 74-1258.

United States Court of Appeals, District of Columbia Circuit.

Argued April 2, 1974.

Decided May 23, 1974.

Samuel Dash, Chief Counsel, Senate Select Committee on Presidential Campaign Activities, Washington, D. C., with whom Rufus Edmisten, Deputy Counsel, James T. Hamilton, Asst. Chief Counsel, Richard B. Stewart, Sp. Counsel, Ronald D. Rotunda, Asst. Counsel, Senate Select Committee on Presidential Campaign Activities, Washington, D. C., Sherman L. Cohn, Eugene Gressman and Jerome A. Barron, Washington, D. C., were on the brief for appellants.

John J. Chester, Washington, D. C., with whom James St. Clair, Boston, Mass., Michael A. Sterlacci, Jerome J. Murphy, Loren A. Smith, Washington, D. C., and Charles Alan Wright, Austin, Tex., was on the brief, for appellee. George P. Williams, Washington, D. C., also entered an appearance for appellee.

Philip A. Lacovara, Counsel to the Sp. Prosecutor, Washington, D. C., with whom Leon Jaworski, Sp. Prosecutor and Peter M. Kreindler, Executive Asst. to the Sp. Prosecutor, Washington, D. C., were on the brief for the Sp. Prosecutor as amicus curiae.

Irving Jaffe, Acting Asst. Atty. Gen., Robert E. Kopp, Washington, D. C., and Thomas G. Wilson, Alexandria, Va., filed a brief on behalf of the United States as amicus curiae.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges.

BAZELON, Chief Judge:

In this suit, the United States Senate Select Committee on Presidential Campaign Activities seeks a declaration that President Richard M. Nixon has a legal duty to comply with its subpoena *duces tecum*, directing him to produce "original electronic tapes" of five conversations between the President and his former Counsel, John W. Dean, III. By memorandum and order of February 8, 1974, the District Court for the District of Columbia denied the Committee's motion for summary judgment and dismissed the suit without prejudice.[1] The Committee appeals. For the reasons stated herein, we affirm.

I.

The Select Committee was created on February 7, 1973, by a resolution of the Senate empowering the Committee to investigate "illegal, improper or unethical activities" occurring in connection with the presidential campaign and election of 1972, and "to determine . . . the necessity or desirability of new congressional legislation to safeguard the electoral process by which the President of the United States is chosen."[2] In testimony before the Committee on July 16, 1973, Alexander Butterfield, a former Deputy Assistant to the President, stated that certain presidential conversations, presumably including those about which Mr. Dean and others had previously testified, had been recorded on electronic tapes. The Committee thereupon attempted informally to obtain certain tapes and other materials from the President. When these efforts proved unsuccessful, the Committee issued the

1. Senate Select Committee on Presidential Campaign Activities v. Nixon, 370 F.Supp. 521 (D.D.C.1974).

2. Senate Resolution 60, 93rd Cong., 1st Sess. § 1(a) (1973).

subpoena that is the subject of this appeal.[3]

This subpoena directed the President to make available to the Committee taped recordings of five conversations that had occurred on specified dates "between President Nixon and John Wesley Dean, III, discussing alleged criminal acts occurring in connection with the Presidential election of 1972."[4] The subpoena was duly served on the President, together with a second subpoena *duces tecum*, requiring production of all records that concerned, directly or indirectly, the "activities, participation, responsibilities or involvement" of twenty-five named persons "in any alleged criminal acts related to the Presidential election of 1972."[5] Both subpoenas were returnable on July 26. By letter dated July 25, 1973, addressed to Senator Ervin as chairman of the Select Committee, the President declined to comply with either subpoena, asserting in justification the doctrine of executive privilege. The President stated that, although he had directed "that executive privilege not be invoked with regard to testimony by present and former members of [his] staff concerning possible criminal conduct," executive privilege was being asserted with respect to "documents and recordings that cannot be made public consistent with the confidentiality essential to the functioning of the Office of the President."[6]

The Committee, in its own name and in the name of the United States, then brought this action to enforce the sub-poenas. It alleged in its complaint that "the subpoenaed electronic tapes and other materials are vitally and immediately needed if the Select Committee's mandate and responsibilities . . . are to be fulfilled."[7] On August 29, the Committee filed a motion for summary judgment, seeking a declaration that the subpoenas were lawful and that the President's refusal to honor them, on the ground of executive privilege or otherwise, was illegal. On October 17, the District Court dismissed the Committee's action for want of statutory subject matter jurisdiction.[8] The Committee appealed to this Court.

While the appeal was pending, the Senate on November 2 passed a resolution stating that the Select Committee is authorized to subpoena and sue the President and that the Committee, in subpoenaing and suing the President, was acting with valid legislative purposes and seeking information vital to the fulfillment of its legitimate legislative functions.[9] The Select Committee asked this Court to hold its appeal in abeyance pending action on a bill, then before Congress, which conferred jurisdiction on the District Court for the District of Columbia in any civil action that the Committee theretofore or thereafter brought "to enforce or secure a declaration concerning the validity of any subpoena." This bill was enacted by Congress and the President having failed to exercise his veto, took effect on December 19, 1973.[10] On December 28, in light of this new jurisdictional stat-

---

3. Section 3(a)(5) of Senate Resolution 60, *supra*, empowers the Committee:
    * * * to require by subpoena * * * any department, agency, officer, or employee of the executive branch of the United States Government * * * to produce for its consideration or for use as evidence in its investigation and study any * * * tapes, or materials relating to any of the matters or questions it is authorized to investigate and study which they or any of them may have in their custody or under their control * * *.

4. Joint Appendix at 26–27.

5. Joint Appendix at 29–33.

6. Joint Appendix at 35.

7. Complaint of the Senate Select Committee on Presidential Campaign Activities, et al., at 8; Joint Appendix at 8.

8. Senate Select Comm. on Presidential Campaign Activities et al. v. Nixon, 366 F.Supp. 51 (D.D.C.1973).

9. Senate Resolution 194, 93rd Cong., 1st Sess. (1973).

10. Pub.L.No. 93–190 (Dec. 18, 1973), to be codified as 28 U.S.C. § 1364.

ute, we remanded the case to the District Court for further consideration.[11]

Following the remand, on January 25, 1974, the District Court issued an order quashing the Committee's subpoena concerning twenty-five individuals. The Court found the subpoena "too vague and conclusory to permit a meaningful response" and, referring to our intervening opinion in Nixon v. Sirica,[12] held the subpoena "wholly inappropriate given the stringent requirements applicable where a claim of executive privilege has been raised."[13] No appeal was taken from this order and the matter is not before us.

At the same time, the District Court issued two orders concerning the subpoena of the five identified tapes. In the first, the Court requested the Watergate Special Prosecutor to submit a "statement concerning the effect, if any, that compliance with [the subpoena] would, in his opinion, be likely to have upon pending criminal cases or imminent indictments under his supervision."[14] In the second order, finding the President's claim of executive privilege "too general and not sufficiently contemporaneous to enable the Court to determine the effect of that claim under the doctrine of Nixon v. Sirica," the Court requested the President to submit "a particularized statement addressed to specific portions of the subpoenaed tape recordings indicating whether he still wishes to invoke executive privilege as to these tapes and, with regard to those portions as to which the privilege is still asserted, if any, the factual ground or grounds for his determination that disclosure to the Select Committee would not be in the public interest."[15] The President responded to this order by letter dated February 6, 1974. Rather than setting forth the particularized claims and rea-

sons for which the District Court had called, the President reasserted executive privilege generally as to all of the subpoenaed material, citing as the bases for his claim the need for confidentiality of conversations that take place in the performance of his constitutional duties, and the possibly prejudicial effects on Watergate criminal prosecutions should the contents of the subpoenaed conversations become public.[16] The latter concern was raised with reference to the President's constitutional duty to see that the laws are faithfully executed.

On February 8, the District Court entered the order at issue here. In the memorandum accompanying the order, the Court dealt first with the President's assertion that the matter before it constituted a non-justiciable political question. Finding the reasoning of this Court in Nixon v. Sirica, which concerned a grand jury subpoena, "equally applicable to the subpoena of a congressional committee," the District Court held that, under that case and the relevant Supreme Court precedents, the issues presented to it were justiciable.[17] The Court then turned, in the terms of Nixon v. Sirica, to a weighing of "the public interests protected by the President's claim of privilege against the public interests that would be served by disclosure to the Committee in this particular instance." The Court found, first, that the Select Committee had failed to demonstrate either "a pressing need for the subpoenaed tapes or that further public hearings before the Committee concerning the content of those tapes will at this time serve the public interest." At the same time, however, the Court rejected the President's claim of privilege insofar as it was premised on the public interest in confidentiality, because, in its view, "the President's un-

---

11. Order, No. 73–2086 (D.C.Cir., Dec. 28, 1973) (en banc).

12. 159 U.S.App.D.C. 58, 73–76, 487 F.2d 700, 716–718 (1973).

13. Order, C.A. 1593–73 (D.D.C. Jan. 25, 1974) ; Joint Appendix at 148.

14. Order, C.A. 1593–73 (D.D.C. Jan. 25, 1973) ; Joint Appendix at 144.

15. Order, C.A. 1593–73 (D.D.C. Jan. 25, 1974) ; Joint Appendix at 139–140.

16. Joint Appendix at 162–63.

17. 370 F.Supp. at 522.

willingness to submit the tapes for the Court's *in camera ex parte* inspection or in any other fashion to particularize his claim of executive privilege precludes judicial recognition of that privilege on confidentiality grounds."[18] The Court then, in the discharge of its duty as a court of equity, undertook independently to weigh the public interest in safeguarding pending criminal prosecutions from possibly prejudicial pretrial publicity, against the Committee's asserted need for the subpoenaed tapes. In the particular circumstances of this case, including the fact that the tapes had already been made available to the June, 1972, grand jury of this district, the Court found it necessary to assign priority to the public interest in "the integrity of the criminal process, rather than the Committee's need." It therefore dismissed the Committee's suit without prejudice.

## II.

The Select Committee contends that, once having determined that the President's general confidentiality privilege failed, the District Court had no authority to engage in a balancing of interests, where the result was to pass judgment on the magnitude of need underlying the Committee's decision to authorize and issue a subpoena. Alternatively, the Committee argues that any such balancing must favor, as more urgently affected with the public interest, the Committee's asserted need over the public interest in the fairness of the criminal process. We find it unnecessary to reach either contention. Neither the Committee's position nor, if we read it correctly, that of the District Court accurately reflects the doctrines of Nixon v. Sirica, doctrines that, at least by analogy, we think controlling here.

In Nixon v. Sirica, we were confronted with a challenge to an order of the District Court, entered as a means of enforcing a grand jury subpoena, requiring the President to produce the subpoenaed items to enable the Court to determine by *in camera* inspection whether the items were exempted from disclosure by evidentiary privilege.[19] In his challenge to this order, the President argued that the District Court had acted beyond its jurisdiction. He contended that he is absolutely immune in all cases from the compulsory process of the courts, and that whenever, in response to a grand jury subpoena, he interposes a formal claim of privilege, that claim without more disables the courts from inquiring by any means into whether the privilege is applicable. We rejected both contentions, holding, contrary to the President, that at least with respect to grand jury subpoenas, it is the responsibility of the courts to decide whether and to what extent executive privilege applies.[20] And we held further that, generally, "application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case."[21]

As in the present case, our attention in Nixon v. Sirica was directed solely to one species of executive privilege—that premised on "the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties."[22] We recognized this great public interest, analogizing the privilege, on the basis of its purpose, "to that between a congressman and his aides under the Speech and Debate Clause; to that among judges, and between judges and their law clerks; and . . . to that contained in the fifth exemption to the Freedom of Information Act."[23] We recognized, moreover, that protection of the presidential decision-making process requires a promise that, as a general matter, its confidentiality would not be

18. *Id.*

19. 487 F.2d at 704.

20. 487 F.2d at 708–716.

21. 487 F.2d at 716.

22. 487 F.2d at 717.

23. *Id.*

invaded, even to the limited extent of a judicial weighing in every case of a claimed necessity for confidentiality against countervailing public interests of the moment.

■ We concluded that presidential conversations are "presumptively privileged," even from the limited intrusion represented by *in camera* examination of the conversations by a court.[24] The presumption can be overcome only by an appropriate showing of public need by the party seeking access to the conversations. In Nixon v. Sirica, such a showing was made by the Special Prosecutor:

> [W]e think that this presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case. The function of the grand jury, mandated by the Fifth Amendment for the institution of federal criminal prosecutions for capital or other serious crimes, is not only to indict persons when there is probable cause to believe they have committed crime, but also to protect persons from prosecution when probable cause does not exist. As we have noted, the Special Prosecutor has made a strong showing that the subpoenaed tapes contain evidence peculiarly necessary to the carrying out of this vital function—evidence for which no effective substitute is available. The grand jury here is not engaged in a general fishing expedition, nor does it seek in any way to investigate the wisdom of the President's discharge of his discretionary duties. On the contrary, the grand jury seeks evidence that may well be conclusive to its decisions in on-going investigations that are entirely within the proper scope of its authority.[25]

We concluded that this strong showing of need was sufficient to overcome the general presumption of privilege premised on the public interest in the confidentiality of the presidential decision-making process. We held that it was within the power of the District Court "[to] order disclosure of all portions of the tapes relevant to matters within the proper scope of the grand jury's investigations, unless the Court judges that the public interest served by nondisclosure of *particular* statements or information outweighs the need for that information demonstrated by the grand jury."[26] It became, therefore, incumbent upon the President to make particularized showings in justification of his claims of privilege, and upon the District Court to follow procedures, including *in camera* inspection, requiring careful deliberation before even the demonstrated need of the grand jury might be satisfied.[27]

### III.

The staged decisional structure established in Nixon v. Sirica was designed to ensure that the President and those upon whom he directly relies in the performance of his duties could continue to work under a general assurance that their deliberations would remain confidential. So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations —we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.[28] Contrary, therefore, to the apparent understanding of the District Court,[29] we think that Nixon v. Sirica requires a showing of the order made by the grand jury before a generalized claim of confidentiality can be said to fail, and before the Presi-

---

24. 487 F.2d at 705, 717–718.

25. 487 F.2d at 717 (citations omitted).

26. 487 F.2d at 718.

27. 487 F.2d at 718–722.

28. 487 F.2d at 722.

29. *See* text and note at note 18, *supra*.

dent's obligation to respond to the subpoena is carried forward into an obligation to submit subpoenaed materials to the Court, together with particularized claims that the Court will weigh against whatever public interests disclosure might serve. The presumption against any judicially compelled intrusion into presidential confidentiality, and the showing requisite to its defeat, hold with at least equal force here.

Particularly in light of events that have occurred since this litigation was begun and, indeed, since the District Court issued its decision, we find that the Select Committee has failed to make the requisite showing. In its papers below and in its initial briefs to this Court, the Committee stated that it seeks the materials in question in order to resolve particular conflicts in the voluminous testimony it has heard, conflicts relating to "the extent of malfeasance in the executive branch," and, most importantly, the possible involvement of the President himself.[30] The Committee has argued that the testimony before it makes out "a *prima facie* case that the President and his closest associates have been involved in criminal conduct," that "the materials sought bear on that involvement," and that these facts alone must defeat any presumption of privilege that might otherwise prevail.[31]

■ It is true, of course, that the Executive cannot, any more than the other branches of government, invoke a general confidentiality privilege to shield its officials and employees from investigations by the proper governmental institutions into possible criminal wrongdoing.[32] The Congress learned

this as to its own privileges in Gravel v. United States,[33] as did the judicial branch, in a sense, in Clark v. United States,[34] and the executive branch itself in Nixon v. Sirica. But under Nixon v. Sirica, the showing required to overcome the presumption favoring confidentiality turned, not on the nature of the presidential conduct that the subpoenaed material might reveal,[35] but, instead, on the nature and appropriateness of the function in the performance of which the material was sought, and the degree to which the material was necessary to its fulfillment. Here also our task requires and our decision implies no judgment whatever concerning possible presidential involvement in culpable activity. On the contrary, we think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions.

■ In its initial briefs here, the Committee argued that it has shown exactly this. It contended that resolution, on the basis of the subpoenaed tapes, of the conflicts in the testimony before it "would aid in a determination whether legislative involvement in political campaigns is necessary" and "could help engender the public support needed for basic reforms in our electoral system." [36] Moreover, Congress has, according to the Committee, power to oversee the operations of the executive branch, to investigate instances of possible corruption and malfeasance in office, and to expose the results of its investigations to public view. The Committee says that with respect to Watergate-related matters, this power has been delegated to it by the

---

30. Brief of the Senate Select Committee, et al., at 27–28.

31. *E.g.*, Supplemental Memorandum of the Senate Select Committee, et al., at 2.

32. Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 788, 794 (1971). *See* Gravel v. United States, 408 U.S. 606, 627, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

33. 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

34. 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

35. 487 F.2d at 718.

36. Brief of Senate Select Committee, et al., at 27–28.

Senate, and that to exercise its power responsibly, it must have access to the subpoenaed tapes.[37]

We turn first to the latter contention. In the circumstances of this case, we need neither deny that the Congress may have, quite apart from its legislative responsibilities, a general oversight power, nor explore what the lawful reach of that power might be under the Committee's constituent resolution. Since passage of that resolution, the House Committee on the Judiciary has begun an inquiry into presidential impeachment. The investigative authority of the Judiciary Committee with respect to presidential conduct has an express constitutional source.[38] Moreover, so far as these subpoenaed tapes are concerned, the investigative objectives of the two committees substantially overlap: both are apparently seeking to determine, among other things, the extent, if any, of presidential involvement in the Watergate "break-in" and alleged "cover-up." And, in fact, the Judiciary Committee now has in its possession copies of each of the tapes subpoenaed by the Select Committee. Thus, the Select Committee's immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative. Against the claim of privilege, the only oversight interest that the Select Committee can currently assert is that of having these particular conversations scrutinized simultaneously by two committees. We have been shown no evidence indicating that Congress itself attaches any particular value to this interest. In these circumstances, we think the need for the tapes premised solely on an asserted power to investigate and inform cannot justify enforcement of the Committee's subpoena.

The sufficiency of the Committee's showing of need has come to depend, therefore, entirely on whether the subpoenaed materials are critical to the performance of its legislative functions.

There is a clear difference between Congress's legislative tasks and the responsibility of a grand jury, or any institution engaged in like functions. While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events; Congress frequently legislates on the basis of conflicting information provided in its hearings. In contrast, the responsibility of the grand jury turns entirely on its ability to determine whether there is probable cause to believe that certain named individuals did or did not commit specific crimes. If, for example, as in Nixon v. Sirica, one of those crimes is perjury concerning the content of certain conversations, the grand jury's need for the most precise evidence, the exact text of oral statements recorded in their original form, is undeniable.[39] We see no comparable need in the legislative process, at least not in the circumstances of this case. Indeed, whatever force there might once have been in the Committee's argument that the subpoenaed materials are necessary to its legislative judgments has been substantially undermined by subsequent events.

By order of May 2, 1974, this Court took judicial notice of the President's public release of transcripts, with partial deletions, of each of the tapes at issue here. In light of the President's action we requested the Select Committee to file a supplemental memorandum stating whether the Committee "has a present sense of need for the materials subpoenaed" and, if so, in what specific respects the transcripts now available to the Committee, and to the public generally, are deficient in meeting that need. In its response to this order, the Committee states, first, that it needs access to the tapes in order to verify the accuracy of the public transcripts. In fact,

---

37. *E.g.*, Reply Brief of Senate Select Committee, et al., at 21–23.

38. U.S.Const., art. I, § 2, ¶5.

39. *See* 487 F.2d at 718.

however, the originals of four of the five tapes subject to the Committee's subpoena have been transmitted by the President to the District Court, pursuant to that Court's order,[40] and are now in the District Court's possession. Thus, as the Committee's counsel acknowledged at oral argument, the subpoena now applies only to the copies of the tapes that remain in the President's possession. This being so, however, the Committee would encounter, in some measure, the same problem of verification with respect to four of the five tapes as it claims now to confront in the transcripts.

The Committee also says that certain portions of the conversations have been deleted from the transcripts, with notations that they contain material "unrelated to Watergate" or "unrelated to Presidential action,"[41] and that, were the tapes played on highly sensitive equipment, portions that the transcripts designate as "inaudible" might be understood. Finally, the Committee argues that inflection and tone of voice that the tapes would supply are indispensable to a correct construction of the conversations. The Committee has, however, shown no more than that the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain. More importantly, perhaps, insofar as such ambiguities relate to the President's own actions, there is no indication that the findings of the House Committee on the Judiciary and, eventually, the House of Representatives itself, are so likely to be inconclusive or long in coming that the Select Committee needs immediate access of its own.

## IV.

In approaching our judicial function, we have no doubt that the Committee has performed and will continue to perform its duties fully in the service of the nation. We must, however, consider the nature of its need when we are called upon, in the first such case in our history, to exercise the equity power of a court at the request of a congressional committee, in the form of a judgment that the President must disclose to the Committee records of conversations between himself and his principal aides. We conclude that the need demonstrated by the Select Committee in the peculiar circumstances of this case, including the subsequent and on-going investigation of the House Judiciary Committee, is too attenuated and too tangential to its functions to permit a judicial judgment that the President is required to comply with the Committee's subpoena. We therefore affirm the order dismissing the Committee's action without prejudice, although on grounds that differ from those announced by the District Court.

Affirmed.

MacKINNON, Circuit Judge (concurring):

I concur in the result reached by the foregoing opinion but have some additional comments.

As I argued in dissent in Nixon v. Sirica, 159 U.S.App.D.C. 58, 87–120, 487 F.2d 700, 729–762 (1973), the President, as distinct from the executive establishment generally, possesses a constitutionally founded privilege enabling him to protect the confidentiality of conferences with his advisors. Recognition of that presidential privilege would dispose of the demands made by the instant subpoena, but failing majority consensus on this point I concur generally in the reasoning of the foregoing opinion as embracing an accurate analysis and sound

---

40. *See* In re Grand Jury Subpoena Duces Tecum to Nixon, 360 F.Supp. 1 (D.D.C. 1973).

41. Supplemental Memorandum of the Senate Select Committee in Response to this Court's Order of May 2, 1974, at 3.

application of the principles established in Nixon v. Sirica. This position evidences no retreat from my previously expressed views on the force, validity and importance of congressional subpoenas, *id.* at 95–96, 487 F.2d at 737–738, nor does it reflect a comparatively higher esteem for judicial subpoenas. Rather, my concurrence today is premised on the basic proposition that enforcement of any subpoena, whether congressional or judicial, depends in the first instance upon an assessment of the immediate purpose, object and need which prompted its issuance. Thus, even though recognizing that the legislative function is no less important than the prosecutorial, I agree that the Senate Committee has failed to demonstrate a present need of sufficient urgency to overcome even the qualified presidential privilege recognized by the majority in Nixon v. Sirica. Additionally, while I would not characterize the Senate Committee's need as "merely cumulative," it bears particular emphasis that legislation involves a cooperative effort of both the House and the Senate, that the House Committee on the Judiciary already possesses the recordings sought here, and that these materials more than likely eventually will be released to the public.

WILKEY, Circuit Judge (concurring):

On my own analysis our logical first conclusion should be that the constitutional principle of separation of powers makes the issue here a political question and therefore not justiciable (Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1968), and Nixon v. Sirica, 159 U.S.App.D.C. 120–157, 487 F.2d 700, 762–799 (1973) (Wilkey, J., dissenting) ); however, I agree that, taking the majority opinion in Nixon v. Sirica as still prevailing, Chief Judge Bazelon's opinion is likewise a sound basis for the action we take, and I therefore join therein without further reservation.