# Assertion of Executive Privilege in Response to a Congressional Subpoena

Executive privilege can and should be asserted to withhold deliberative, predecisional documents from Congress, where release of the documents would seriously impair the deliberative process and the conduct of foreign policy, and where Congress' only stated interest in obtaining the documents is for general oversight purposes.

Where Congress has a legitimate need for information that will help it legislate, and the Executive Branch has a legitimate constitutionally recognized need to keep information confidential, each branch has an obligation to make a principled effort to accommodate the needs of the other.

October 13, 1981

THE PRESIDENT
        THE WHITE HOUSE

DEAR MR. PRESIDENT: You have requested my advice concerning the propriety of an assertion of executive privilege in response to a subpoena issued by the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce (Subcommittee). The subpoena was issued on September 28, 1981, and served on the Department of the Interior on October 2, 1981.* It demands the production of certain documents by October 14, 1981. It seeks "[a]ll documents relative to the determination of reciprocity under the Mineral Lands Leasing Act, 30 U.S.C. § 181, including documents relating to the general matter of reciprocity and the specific question of the status of Canada, utilized or written by officials and staff of the Department of Interior on or before September 18, 1981." [1] The Office of Legal Counsel of the Department of Justice has examined documents embraced by the subpoena and identified by the Department of the Interior as being potentially subject to a claim of executive privilege, and has concluded that a proper claim of privilege may be asserted with respect to all of the documents identified in the attachment hereto. I

---

*NOTE: The full text of the subpoena and related correspondence can be found in *Contempt of Congress: Hearings on the Congressional Proceedings Against Interior Secretary James G. Watt Before the Subcommittee on Oversight and Investigation of the House Committee on Energy and Commerce,* 97th Cong., 2d Sess. (1982). Ed

[1] The Mineral Lands Leasing Act (Act) provides, in pertinent part, that "citizens of another country, the laws, customs or regulations of which deny similar or like privileges to citizens of this country, shall not by stock ownership, stock holding, or stock control, own any interest in any lease acquired under the provisions of this Act." 30 U.S.C. § 181.

concur in that conclusion. I believe that the documents identified are properly subject to a claim of executive privilege and that the privilege should be asserted with respect to those documents.

I.

I understand that on September 24, 1981, the Department of the Interior supplied the Subcommittee with a large number of the materials presently demanded by the subpoena, including a list of 36 published sources and copies of 143 documents. Once the subpoena was issued, the Department of the Interior, in consultation with other departments having an interest in the matter, including the Departments of State, Commerce, Treasury, Justice, and the Offices of the United States Trade Representative and the White House Counsel, once again reviewed the documents which had not previously been provided to the Subcommittee. In an effort to make every reasonable accommodation to the legitimate needs of the Legislative Branch, the Department of the Interior released an additional 31 documents to the Subcommittee on October 9, 1981. One document was shown to the Subcommittee staff at that time but was not released. In addition, the Subcommittee was provided with a written list and oral description of the 31 documents which had been withheld. The Subcommittee staff was permitted to ask questions concerning the nature of those documents, a procedure designed to provide the Subcommittee with enough information to assure itself that the documents are not essential to the conduct of the Subcommittee's legislative business. Finally, the Subcommittee was informed that an additional 5–10 documents would be released once the Department of the Interior had concluded its deliberations regarding the status of Canada under the Act.

All of the documents in issue are either necessary and fundamental to the deliberative process presently ongoing in the Executive Branch or relate to sensitive foreign policy considerations. Several of the documents reflect views of officials of the Canadian government transmitted in confidence to United States officials as well as statements regarding the status of Canada by officials of the Department of State. Other documents, prepared for the Cabinet Council on Economic Affairs and the Cabinet-level Trade Policy Committee, are predecisional, deliberative memoranda which have been considered by officials at the highest levels of government. Both the Cabinet Council and the Trade Policy Committee prepare recommendations for presidential action; in addition, you personally attend some Cabinet Council meetings and chair these meetings when you do attend. Finally, a large portion of the documents being withheld reflect internal deliberations within the Department of the Interior regarding the status of Canada under the Act. Some of these documents are staff level advice to policymakers containing recommendations regarding decisions which have not yet

28

become final. Others contain internal Interior Department deliberations regarding its participation in the Trade Policy Staff Committee and the Cabinet Council on Economic Affairs. Still other documents reflect tentative legal judgments regarding questions arising under the Act. In addition, the subpoena encompasses preliminary drafts of congressional testimony by the Secretary of the Interior. These latter documents, although generated at levels below that of the Cabinet and subcabinet, are of a highly deliberative nature and involve an ongoing decisional process of considerable sensitivity.

## II.

The Office of Legal Counsel of the Department of Justice has examined each of these documents and has concluded that they may properly be withheld from the Congress at this time. These documents are quintessentially deliberative, predecisional materials. Each of the agencies which generated the documents has stated that their release to the Subcommittee would seriously interfere with or impede the deliberative process of government and, in some cases, the Nation's conduct of its foreign policy. Because the policy options considered in many of these documents are still under review in the Executive Branch, disclosure to the Subcommittee at the present time could distort that decisional process by causing the Executive Branch officials to modify policy positions they would otherwise espouse because of actual, threatened, or anticipated congressional reaction. Moreover, even if the decision at issue had already been made, disclosure to Congress could still deter the candor of future Executive Branch deliberations, because officials at all levels would know that they could someday be called by Congress to account for the tentative policy judgments which they had earlier advanced in the councils of the Executive Branch. As the Supreme Court has noted, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States* v. *Nixon,* 418 U.S. 683, 705 (1974). You must have access to complete and candid advice in order to provide the soundest basis for presidential decisions. I have concluded that release of these documents would seriously impair the deliberative process and the conduct of foreign policy. There is, therefore, a strong public interest in withholding the documents from congressional scrutiny at this time.

Against this strong public interest I must consider the interest of Congress in obtaining these documents. The Subcommittee, in its letter to Secretary Watt of August 13, 1981, stated that it was conducting a "legislative oversight inquiry" into the impact of Canadian energy policies upon American companies. The Subcommittee's next formal communication to Secretary Watt, the subpoena issued on September 28

and served October 2, did not further explain the Subcommittee's need for the information. I therefore presume that the Subcommittee's interest in obtaining these documents is one of legislative oversight.[2]

Congress does have a legitimate interest in obtaining information to assist it in enacting, amending, or repealing legislation. This interest extends beyond information bearing on specific proposals for legislation; it includes, as well, the congressional "oversight" function of being informed regarding the manner in which the Executive Branch is executing the laws which Congress has passed. Such oversight enables the Legislative Branch to identify at an early stage shortcomings or problems in the execution of the law which can be remedied through legislation.

While I recognize the legitimacy of the congressional interest in the present case, it is important to stress two points concerning that interest. First, the interest of Congress in obtaining information for oversight purposes is, I believe, considerably weaker than its interest when specific legislative proposals are in question. At the stage of oversight, the congressional interest is a generalized one of ensuring that the laws are well and faithfully executed and of proposing remedial legislation if they are not. The information requested is usually broad in scope and the reasons for the request correspondingly general and vague. In contrast, when Congress is examining specific proposals for legislation, the information which Congress needs to enable it to legislate effectively is usually quite narrow in scope and the reasons for obtaining that information correspondingly specific. A specific, articulated need for information will weigh substantially more heavily in the constitutional balancing than a generalized interest in obtaining information. *See United States* v. *Nixon, supra; Senate Select Committee on Presidential Campaign Activities* v. *Nixon,* 498 F.2d 725, 731-33 (D.C. Cir. 1974) *(en banc).*

Second, the congressional oversight interest will support a demand for predecisional, deliberative documents in the possession of the Executive Branch only in the most unusual circumstances. It is important to stress that congressional oversight of Executive Branch actions is justifiable only as a means of facilitating the legislative task of enacting, amending, or repealing laws. When such "oversight" is used as a means of participating directly in an ongoing process of decisionmaking within the Executive Branch, it oversteps the bounds of the proper legislative function. Restricted to its proper sphere, the congressional oversight function can almost always be properly conducted with reference to information concerning decisions which the Executive Branch has al-

---

[2] The House Committee on Energy and Commerce does have pending before it several bills, H.R. 4033, H.R. 4145, and H.R. 4186, which would amend the Act in certain respects. The pendency of these bills has not been formally asserted as a reason for obtaining the documents. Moreover, the documents requested appear to have a tangential relevance at best to the subject matter of the bill.

ready reached. Congress will have a legitimate need to know the preliminary positions taken by Executive Branch officials during internal deliberations only in the rarest of circumstances. Congressional demands, under the guise of oversight, for such preliminary positions and deliberative statements raise at least the possibility that the Congress has begun to go beyond the legitimate oversight function and has impermissibly intruded on the Executive Branch's function of executing the law. At the same time, the interference with the President's ability to execute the law is greatest while the decisionmaking process is ongoing.

Applying the balancing process required by the Supreme Court, it is my view that the Executive Branch's interests in safeguarding the integrity of its deliberative processes and its conduct of the Nation's foreign policy outweigh the stated interest of the Subcommittee in obtaining this information for oversight purposes. It is, therefore, my view that these documents may properly be withheld from the Subcommittee at the present time.

## III.

Finally, a brief word is in order concerning the negotiations between the Department of the Interior and the Subcommittee during this dispute. In cases in which the Congress has a legitimate need for information that will help it legislate and the Executive Branch has a legitimate, constitutionally recognized need to keep information confidential, the courts have referred to the obligation of each branch to accommodate the legitimate needs of the other. *See United States* v. *American Tel. & Tel. Co.,* 567 F.2d 121, 127, 130 (D.C. Cir. 1977); *see generally United States* v. *Nixon, supra.* The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch.

It is my view that the Executive Branch has made such a principled effort at accommodation in the present case. Prior to the issuance of the subpoena, the Department of the Interior supplied the Subcommittee with a large number of the documents subsequently requested by the subpoena. In response to the subpoena, the interested Executive Branch departments reviewed those documents which had been withheld and identified documents that could be supplied in an effort to further accommodate the Subcommittee's needs. Substantial additional materials were released to the Subcommittee on October 9, 1981, despite the fact that at least some of these materials were deliberative in nature and therefore presumptively subject to a claim of privilege. Moreover, the Department of the Interior has promised to release additional material once its deliberations regarding the status of Canada under the Act are completed. Finally, members of the Subcommittee staff were provided

a comprehensive list of the materials being withheld from disclosure, and were briefed orally by the various federal agencies regarding the nature of those documents.

In contrast, the Subcommittee has not to date shown itself sensitive to the legitimate needs of the Executive Branch. As noted, it has never formally stated its need for the materials beyond a generalized interest in "oversight." It responded to the submission of documents by the Executive Branch on September 24 by issuing a subpoena four days later—a subpoena which was broader in scope than the Subcommittee's original August 13 request. To date, the Subcommittee has shown little interest in accommodating legitimate interests of the Executive Branch in safeguarding the privacy of its deliberative processes and conducting the Nation's foreign policy. This lack of accommodation on the Subcommittee's part lends further support to my conclusion that the documents in question may properly be withheld.

In conclusion, it is my opinion that the documents now being withheld are well within the scope of executive privilege. The process by which the President makes executive decisions and conducts foreign policy would be irreparably impaired by production of these documents at this time. I recommend that executive privilege be asserted.

Sincerely,
WILLIAM FRENCH SMITH