# Investigative Authority of the General Accounting Office

The General Accounting Office lacks statutory authority to review the Executive's discharge of its constitutional foreign policy responsibilities.

GAO is precluded by the Intelligence Oversight Act from access to intelligence information.

The memorandum also reviews generally the executive privilege principles that apply in the contexts of intelligence, law enforcement, and deliberative process information.

August 16, 1988

MEMORANDUM OPINION FOR THE EXECUTIVE SECRETARY
NATIONAL SECURITY COUNCIL

## Introduction and Summary

This memorandum is in response to your request for the opinion of this Office on whether, or to what extent, the Administration has a legal basis for declining to cooperate with the pending General Accounting Office ("GAO") investigation concerning U.S. foreign policy decisions with respect to Manuel Noriega. In its June 23, 1988 letter to the National Security Council, GAO described the nature and purpose of the investigation: In order to evaluate whether "information about illegal activities by high level officials of other nations may not be adequately considered in U.S. foreign policy decisions . . . , the General Accounting Office is undertaking an initial case study of how information about General Noriega was developed by various government agencies, and what role such information played in policy decisions regarding Panama." As stated in the National Security Council's response to GAO of July 13, 1988, representatives of GAO have made it clear that GAO's "three areas of interest [are] intelligence files, law enforcement files, and the deliberative process of the Executive branch, including internal communications and deliberations leading to Executive branch actions taken pursuant to the President's constitutional authority."

Specifically, you have asked this Office to advise you as to whether the GAO investigation is within GAO's statutory authority; whether there are statutory or constitutional grounds for denying GAO's request to the extent it is directed specifically at intelligence information, at law enforcement information, or at deliberative process information; and whether there are other grounds for denying GAO's request in whole or in part. As explained below, we conclude that on the present record the GAO investigation is beyond GAO's statutory investigative

171

authority.[1] Because of this conclusion it is unnecessary to address any constitutional basis for challenging GAO's authority to conduct the investigation. In addition, we are unable to evaluate the strength of any constitutional objection to providing particular information because specific information requests have not yet been made. As a matter of general guidance, however, we outline the constitutional principles which would be applied in evaluating whether particular information can be withheld.

## I. Authority to Conduct the Investigation

### A. GAO's Investigative Authority

#### 1. Statutory Limitations

GAO's investigative authority is set forth in subchapter II of chapter 7 of title 31 of the U.S. Code. Except for section 717(b), the various grants of authority in subchapter II are limited to auditing the finances of government agencies and are thus inadequate bases for the GAO Noriega investigation, which clearly goes well beyond a financial audit. See 31 U.S.C. §§ 711–715. Accordingly, GAO must base this investigation on its authority in section 717(b) to "evaluate the results of a program or activity the Government carries out *under existing law*." 2 Op. O.L.C. 415, 420 (1978) (emphasis added) (where a GAO investigation goes beyond fiscal matters, GAO's authority must be based on section 204(a), the substantially identical predecessor version of section 717(b)).

We believe as a matter of statutory construction that the phrase "program or activity . . . *under existing law*" must refer only to activities carried out pursuant to statute, and not activities carried out pursuant to the Executive's discharge of its own constitutional responsibilities.[2] The juxtaposition of "program or activity" with "existing law" strongly suggests an intent to refer to statutory responsibilities. Moreover, the use of the qualifier "existing" appears to suggest that the laws at issue are statutes that may lapse rather than constitutional authorities of the President, which are of greater permanence. Finally, the legislative history of section 717(b) confirms that Congress' focus of concern was the oversight of its legislative programs: "It is intended that in performing [evaluations under section 717(b)], the Comptroller General shall review and analyze Government program results in a manner which will assist the Congress to determine whether those programs and activities are achieving the objectives of the law." H.R. Rep. No. 1215, 91st Cong., 2d Sess. 82 (1970). Nothing in the legislative history man-

---

[1] Moreover, in addition to GAO's lack of statutory authority to pursue this investigation, we believe that the Intelligence Oversight Act for Fiscal Year 1981, Pub. L. No. 96–450, § 407, 94 Stat. 1975, 1981 (1980), extinguishes whatever authority GAO might otherwise possess in gaining access to intelligence information

[2] The views we express here concerning the limitations on GAO's investigative authority under section 717(b) are not novel. In 1978, the Office opined that GAO's authority under the similarly worded predecessor to 717(b) did not extend to the discharge of the President's constitutional, as opposed to statutory, responsibilities. 2 Op. O.L.C. 415, 420 (1978) ("[T]he appointment of officers of the United States by the President by and with the advice of the Senate does not constitute a Government program or activity carried out under existing law . . . .").

ifests any congressional intent to extend GAO's investigative authority beyond statutory programs into the Executive's discharge of its constitutional responsibilities. *See* S. Rep. No. 924, 93d Cong., 2d Sess. 72 (1974); S. Rep. No. 202, 91st Cong., 1st Sess. (1969); H.R. Rep. No. 1215, *supra*, at 18, 34, 81–84; 116 Cong. Rec. 24,597 (1970).

### 2. *GAO Has Not Justified its Investigation Under Section 717(b)*

We conclude on the record before us that GAO has not established that it has authority under section 717(b) to pursue this investigation. The subject of the investigation according to GAO is foreign policymaking, a subject matter which is generally within the purview of the President's power under Article II of the Constitution. GAO has failed to assert any interest in evaluating the results of any specific statutory program or activity that may relate to foreign policy.

As this Office has consistently observed,[3] Section 1 of Article II confers on the President plenary authority to represent the United States and to pursue its interests outside the borders of the country, subject only to limits specifically set forth in the Constitution itself and to such statutory limitations as the Constitution permits Congress to impose by exercising one of its enumerated powers. *See generally United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936). Specifically, the President's constitutional authority includes the authority to negotiate with foreign nations, to articulate the foreign policy of the United States, to carry out diplomatic and intelligence missions, and to protect the lives of Americans abroad. *Id.*

Of course, pursuant to its own substantial authority under the Commerce Clause and its exclusive power of appropriation, Congress has enacted statutes that relate to the foreign policy of the United States. For instance, Congress has appropriated funds for foreign assistance and enacted statutes regulating arms sales to foreign governments. If GAO were to express a specific interest in materials relating to such statutes, there would be reasonable and legitimate questions as to which materials were within the scope of GAO's section 717(b) authority, and which were not.

The request before us, however, does not present these close questions. The GAO letter of June 23, 1988 makes it clear that foreign policymaking is the subject of the GAO investigation, and it provides no basis for concluding that GAO is interested in reviewing Executive foreign policymaking pursuant to statutory authority. The GAO letter states that the GAO investigation is premised on a concern that "information about illegal activities by high level officials of other nations may not be adequately considered in U.S. foreign policy decisions" and that it is directed at learning "what role [information about General Noriega] played in policy decisions regarding Panama." The GAO letter thus demonstrates an in-

---

[3] *See, e g ,* Memorandum for Judith H. Bello, General Counsel, Office of the United States Trade Representative, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re The President's Authority to Terminate the International Express Mail Agreement With Argentina Without the Consent of the Postal Service* (June 2, 1988).

terest in our "diplomatic" or "national security" foreign relations with Panama and General Noriega, and provides no basis for concluding that it relates to activities undertaken by the Executive under any specific statute.

We therefore conclude based on the nature of the GAO request that the subject of the GAO investigation is the Executive's discharge of its constitutional foreign policy responsibilities, not its statutory responsibilities. The subject is thus not "a program or activity the Government carries our under existing law," and it is beyond GAO's authority under 31 U.S.C. § 717(b). Accordingly, unless this request is tailored to inquire specifically about a program or activity carried out under existing statutory law, we believe there is no obligation to grant GAO access to executive branch agencies for purposes of conducting this investigation.

### B. Intelligence Oversight

In addition to the infirmity in GAO's statutory authority to pursue this investigation, we believe that GAO is specifically precluded by statute from access to intelligence information. In establishing by law the oversight relationship between the intelligence committees and the executive branch, Congress indicated that such oversight would be the exclusive means for Congress to gain access to confidential intelligence information in the possession of the executive branch.[4]

This intelligence oversight system has been codified at 50 U.S.C. § 413. That section sets forth requirements for the Director of Central Intelligence, the heads of all other federal agencies involved in intelligence activities, and the President to inform the Congress through the intelligence committees (and in some circumstances the Speaker and minority leader of the House of Representatives and the majority and minority leaders of the Senate) of intelligence activities.

The legislative history of section 413 makes it clear that both the legislative and executive branches believed they were establishing a comprehensive scheme for congressional oversight of intelligence activities that would constitute the exclusive means of congressional oversight. As President Carter stated when he signed the section into law, it

> establishes, for the first time in statute, a comprehensive system
> for congressional oversight of intelligence activities .... The over-
> sight legislation that was passed . . . codifies the current practice

---

[4] As a general matter, intelligence gathering is often viewed as a form of diplomatic activity that is within the President's Article II powers. As Professor Louis Henkin has noted, "[t]he gathering of information is a principal purpose of sending ambassadors and maintaining diplomatic relations, an exclusive Presidential power. It is only a small extension to conclude that gathering information by any means is part of the President's 'eyes and ears' function. There is, therefore, a strong case for presidential authority to obtain intelligence not only through our embassies but also through our agents representing the Executive . . . ." Letter from Louis Henkin to Representative Louis Stokes, March 31, 1987, *reprinted in H.R. 1013, H.R. 1371, and Other Proposals Which Address the Issue of Affording Prior Notice of Covert Actions to Congress: Hearings Before the Subcomm on Legislation of the House Permanent Select Comm. on Intelligence*, 100th Cong., 1st Sess. 221 (1987).

and relationship that has developed between this administration and the Senate and House intelligence committees over the past 3 years.[5]

Senator Huddleston, sponsor of the floor amendment containing the version of section 413 that was enacted into law, emphasized upon the amendment's introduction the comprehensive and exclusive nature of the scheme being established: "this amendment is identical to Senate bill 2284 which the Senate passed by a vote of 89 to 1 on June 3 of this year. It is a bill that establishes the congressional oversight procedures dealing with our intelligence agencies."[6] Senator Huddleston also agreed, in a floor colloquy with Senator Javits on S. 2284, with the following statement by Senator Javits:

> I agree thoroughly with the need for simplifying [the practice of the oversight committees]. There are some seven committees here that could have had this wrestling match with the executive . . . . I am satisfied . . . that the method we now have chosen . . . represents a fair, effective, and objective way in which to accomplish the results of simplifying the intelligence relations between the President and Congress . . . and limiting further the opportunities for misadventure, premature disclosure, and so forth . . . . What we are doing is simply legislating . . . a new arrangement or modus vivendi for the handling of information and consultations between Congress and the intelligence agencies . . . .[7]

The Senate report on S. 2284 also confirms the understanding that congressional oversight with respect to intelligence matters was to be limited to the intelligence committees. In the "general statement" that preceded the section by section analysis, the report noted:

> Out of necessity, intelligence activities are conducted primarily in secret. Because of that necessary secrecy, they are not subject to public scrutiny and debate as is the case for most foreign policy and defense issues. Therefore, the Congress, *through its intelligence oversight committees*, has especially important duties in overseeing these vital activities by the intelligence agencies of the United States. *[50 U.S.C. § 413] is intended to authorize the process by which information concerning intelligence activities*

---

[5] 16 Weekly Comp. Pres. Doc. 2231 (Oct. 14, 1980).

[6] 126 Cong. Rec. 17,692 (1980).

[7] 126 Cong. Rec. 17,692–93 (1980) Senator Moynihan agreed with the position of Senators Huddleston and Javits that a major purpose of the Intelligence Oversight Act was to reduce the number of congressional committees that sought intelligence information: "there is a rule of intelligence, which the Senator [Javits] knows well from his wartime experience, which is that you protect sensitive information by compartmentation. The more important that matter is the fewer persons you want to know about it . . . ." *Id.* at 17,694.

*of the United States is to be shared by the two branches* in order to enable them to fulfill their respective duties and obligations to govern intelligence activities within the constitutional framework. The Executive branch and the intelligence oversight committees have developed over the last four years a practical relationship based on comity and mutual understanding, without confrontation. The purpose of [section 413] is to carry this working relationship forward into statute.[8]

Based on the evidence of intent on the part of both the legislative and executive branches that oversight by the intelligence committees would be the exclusive method of congressional oversight concerning intelligence information, we conclude that 50 U.S.C. § 413 stands as statutory authority for the Administration to decline to provide GAO with access to any intelligence information sought in the Noriega investigation.

## II. Executive Privilege

Should GAO, in response to an appropriate direction from Congress, subsequently undertake an investigation properly related to its statutory authority, it would then be necessary to review established principles concerning the maintenance of confidentiality with respect to certain executive branch information. Congressional investigations normally do not pose this problem to the degree suggested by the pending GAO investigation because they are properly tailored to address non- confidential subjects. Disturbingly, and in contrast, the type of information in which GAO expressed interest in its letter of June 23, 1988 suggests a desire to review confidential material generally not available outside the executive branch, such as intelligence, law enforcement, and deliberative process information.[9]

Since GAO has not yet made any specific requests, we cannot analyze the case for withholding any particular document or information. What we do below is summarize briefly the general executive privilege principles that apply in the individual contexts of intelligence, law enforcement, and deliberative process information.

### A. Protection of Intelligence Information

In the hierarchy of executive privilege, the "protection of national security" constitutes the strongest interest that can be asserted by the President and one to

---

[8] S Rep. No. 730, 96th Cong., 2d Sess. 5 (1980) (emphasis added) More specifically, the Senate report stated that "[t]his amendment repeals the congressional reporting requirement of the Hughes-Ryan Amendment of 1974 ... The effect is to limit reporting to the two intelligence oversight committees, as compared with the seven committees that now receive such reports ..." *Id* at 5.

[9] This subject is usually discussed in terms of "executive privilege," and we will use that convention here. The question, however, is not strictly speaking just one of executive privilege. The privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena

176

which the courts have traditionally shown the utmost deference. In *United States v. Nixon*, for instance, the Court contrasted President Nixon's claim of executive privilege based on the Executive's general interest in confidentiality with a claim based on the President's national security responsibilities:

> [President Nixon] does not place his claim of privilege on the ground they are military or diplomatic secrets. As to these areas of Art. II duties the Courts have traditionally shown the *utmost deference* to Presidential responsibilities.

418 U.S. 683, 710 (1974) (emphasis added).

### B. Protection of Law Enforcement Information

With respect to open law enforcement files, it has been the policy of the executive branch throughout our Nation's history to protect these files from any breach of confidentiality, except in extraordinary circumstances. Attorney General Robert H. Jackson well articulated the basic position:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information that Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941).

There are, however, circumstances in which the Department of Justice may decide to disclose to Congress information about prosecutorial decisions. This is particularly true where an investigation has been closed without further prosecution. In such a situation concerns about real or perceived congressional interference with an investigation, and about the effects of undue pretrial publicity on a jury, would disappear. Still, extreme caution must be applied whenever the disclosure of such records is contemplated. Much of the information in a closed criminal enforcement file such as unpublished details of allegations against par-

ticular individuals and details that would reveal confidential sources and investigative techniques and methods would continue to merit protection.

### C. Protection of Deliberative Process Information

The Constitution gives the President the power to protect the confidentiality of deliberations within the executive branch. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 446 455 (1977); *United States v. Nixon*, 418 U.S. at 708. This is independent of the President's power over foreign affairs or national security, or law enforcement; it is rooted instead in "the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.* at 708. The Supreme Court has held that, for this reason, communications among the President and his advisers enjoy "a presumptive privilege" against disclosure in court. *Id.*

The reasons for this privilege, the Court said in *United States v. Nixon*, are "plain." "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705. Often, an advisor's remarks can be fully understood only in the context of a particular debate and of the positions others have taken. Advisors change their views, or make mistakes which others correct; this is indeed the purpose of internal debate. The result is that advisors are likely to be inhibited if they must anticipate that their remarks will be disclosed to others, not party to the debate, who may misunderstand the significance of a particular statement or discussion taken out of context. Some advisors may hesitate out of self interest to make remarks that might later be used against their colleagues or superiors. As the Supreme Court has stated, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* at 708.

These reasons for the constitutional privilege have at least as much force when it is Congress, instead of a court, that is seeking information.[10] The United States Court of Appeals for the District of Columbia Circuit has explicitly held that the privilege protects presidential communications against congressional inquiries.[11]

---

[10] The Supreme Court has assumed that the constitutional privilege protects executive branch deliberations against Congress to some degree. *See United States v Nixon*, 418 U S. at 712 n.19. Moreover, in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977), the Court held that the constitutional privilege protects executive branch deliberations from disclosure to members of the *same* branch in a later administration; the Court rejected the specific claim of privilege in that case not because the privilege was inapplicable but because the intrusion was limited and the interests justifying the intrusion were strong and nearly unique. *See id.* at 446–55.

[11] During the Watergate investigation the court of appeals rejected a Senate committee's efforts to obtain tape recordings of conversations in President Nixon's offices The court held that the tapes were constitutionally privileged and that the committee had not made a strong enough showing to overcome the privilege. *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C Cir 1974) (en banc). The court held that the committee was not entitled to the recordings unless it showed that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions " *Id* at 731 (emphasis added).

178

## D. Accommodation with Congress

### 1. Governing Principles

Because a claim of executive privilege is not absolute, the executive branch has a duty to seek to accommodate requests that are within Congress' legitimate oversight powers. *See United States v. AT&T*, 567 F.2d 121, 127 130 (D.C. Cir. 1977) (suggesting that, even when a claim of executive privilege rests on national security grounds, the Executive does not enjoy clear and absolute discretion to deny legitimate congressional requests for information, but that each of the two branches must attempt to balance and accommodate the legitimate needs of the other).[12] This duty of accommodation means that the Executive should attempt to satisfy the requests of Congress as completely as it can without making harmful disclosures. *See* Memorandum for the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee* (Jan. 13, 1981). In this spirit, the Executive has occasionally offered Congress summaries of documents prepared in such a manner as not to disclose, for example, deliberative aspects that might chill executive branch decisionmaking. *See id.* at 22–23.

The nature of the accommodation required in responding to a congressional request for information depends on the balance of interests between the Executive and Congress. In order for its interests to be given weight, Congress must articulate its need for the particular materials; it must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged documents (or testimony) it has requested, and show that the material "is demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d at 731, 733.[13]

---

[12] It should be emphasized, however, that in *United States v. AT&T* the information Congress sought related to wiretaps on American citizens placing telephone calls from the United States. Although these wiretaps were justified on national security grounds and the President, in turn, could assert national security as a basis for withholding the information, Congress clearly had a substantial interest in this subject matter, because the wiretaps implicated the individual rights of American citizens. Accordingly, we believe that a court may view the relative weights of executive and legislative interests differently when the information sought relates directly to the conduct of foreign relations rather than to the rights of American citizens.

[13] In *Senate Select Committee*, for example, the court held that the committee had not made a sufficient showing of need for copies of the presidential tape recordings, given that the President had already released transcripts of the recordings. The committee argued that it needed the tape recordings "in order to verify the accuracy of" the transcripts, to supply the deleted portions, and to gain an understanding that could be acquired only by hearing the inflection and tone of voice of the speakers. But the court answered that in order to legislate a committee of Congress seldom needs a "precise reconstruction of past events." 498 F.2d at 732. "The Committee has . . . shown no more than that the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain." *Id.* at 733. For this reason, the court stated, "the need demonstrated by the Select Committee . . is too attenuated and too tangential to its functions" to override the President's constitutional privilege *Id*

179

## 2. *Procedural Issues*

Only rarely do congressional requests for information result in a subpoena of an executive branch official or in other congressional action. In most cases the informal process of negotiation and accommodation recognized by the courts, and mandated for this Administration by President Reagan,[14] is sufficient to resolve any dispute. On occasion, however, the process breaks down, and a subpoena is issued by a congressional committee or subcommittee.[15] At that point, it would be necessary to consider asking the President to assert executive privilege. Under the terms of the President's Memorandum, executive privilege cannot be asserted vis-a-vis Congress without specific authorization by the President, based on recommendations made to him by the concerned department head, the Attorney General, and the Counsel to the President.

## Conclusion

We believe that there are statutory grounds which preclude GAO's present request for access to executive branch agencies for the purposes of conducting the investigation described in its letter of June 23, 1988. Should GAO's request be reformulated in a manner which properly relates it to a congressional interest within the terms of 31 U.S.C. § 717(b) and which comports with the statutory restrictions on access to intelligence information found in 50 U.S.C. § 413, it will be appropriate at that time to consider the application of additional lawful authority to withhold particular national security, intelligence, law enforcement, or deliberative process information. This Office is available for consultation with respect to requests for particular documents or information.

DOUGLAS W. KMIEC
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[14] President Reagan's November 4, 1982 Memorandum for the Heads of Executive Departments and Agencies on "Procedures Governing Responses to Congressional Requests for Information" states:

> The policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . . [E]xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches.

[15] In the current context, such a subpoena could only be issued after GAO had reported to its congressional requester that it was unable to obtain the information from the executive branch. Before requesting that a congressional committee issue a subpoena, GAO might attempt to enforce its request for information pursuant to the judicial enforcement mechanism authorized under 31 U S C § 716. Such a course of action could be successfully resisted by the executive branch without a claim of executive privilege, however, because judicial enforcement is precluded whenever the Director of the Office of Management and Budget or the President certify that the information could be withheld under exemptions (b)(5) (information withholdable in litigation) or (b)(7) (law enforcement information) of the Freedom of Information Act (5 U.S.C. § 552(b)(5), (b)(7)) and "disclosure reasonably could be expected to impair substantially the operations of the Government." 31 U S C § 716(d)(1)(C). Upon such a certification, GAO would presumably refer enforcement to the congressional committee.

180