# Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress

Statute requiring the Administrator of the Federal Aviation Administration (FAA) to transmit concurrently to Congress any budget information and legislative recommendations that are transmitted to the Secretary of Transportation, the Office of Management and Budget (OMB), and the President, would, if interpreted strictly, on its face violate the constitutional principle of separation of powers.

Separation of powers requires that the President have ultimate control over subordinate officials who perform purely executive functions, which includes the right to supervise and review the work of such officials; this principle, coupled with the constitutional protection afforded the deliberative process within the Executive Branch, creates an area of executive prerogative that may not be invaded by a coordinate branch of government absent a very compelling and specific need

Disclosure to Congress of unreviewed recommendations by subordinates within the Executive Branch would disrupt the normal interchange between agency heads and the President in connection with the decisionmaking process, and interfere with the President's ability to supervise the actions of his subordinate officials while this process is going on, thus adversely affecting the President's ability to carry out his responsibilities.

Because there appears to be no specific or compelling congressional need for the information at issue in this case, the concurrent reporting requirement can and should be construed so as to avoid constitutional infirmity, by allowing the FAA Administrator to provide Congress with budget data and legislative comments only after they have been approved by the Administrator's superiors in the Executive Branch, including, where appropriate, the President and OMB.

November 5, 1982

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF TRANSPORTATION

This responds to your request for the advice of this Office regarding your implementation of § 506(f) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 677 (1982), which requires the Administrator of the Federal Aviation Administration (Administrator) to transmit certain budget information and legislative recommendations directly to Congress at the same time that they are transmitted to the Secretary of Transportation (Secretary), the President, or the Office of Management and Budget (OMB). Specifically, you have expressed concern that this provision may conflict with the principle of separation of powers under the Constitution. In response to your request, we have reviewed the relevant statutory provisions, case law concerning separation of powers, the Constitution itself and the history of its development,

632

and prior opinions of this Office on this general subject. On the basis of this review, we have concluded that, if interpreted strictly, the statutory provision would, on its face, violate the separation of powers which is central to the structure of the United States Constitution.

As discussed in Section II of this opinion, several clearly established principles of the separation of powers doctrine apply to the question raised by the concurrent reporting provision. The separation of powers requires that the President have ultimate control over subordinate officials who perform purely executive functions and assist him in the performance of his constitutional responsibilities. This power includes the right to supervise and review the work of such subordinate officials, including reports issued either to the public or to Congress. This supervisory control is reinforced by the constitutional protection afforded to the deliberative process within the Executive Branch. These principles combine to create an area of executive prerogative that may not be invaded by a coordinate branch of government absent a very compelling and specific need.

As detailed in Section III, a requirement that subordinate officials within the Executive Branch submit reports directly to Congress, without any prior review by their superiors, would greatly impair the right of the President to exercise his constitutionally based right to control the Executive Branch. This interference contrasts with the relatively nonspecific request for information embodied in § 506(f). In balancing Congress' limited apparent need for direct reports against the President's right to control subordinates within the Executive Branch, it seems clear that § 506(f) would be unconstitutional if it were construed to require the Administrator to report to Congress without prior review by his superiors.

In Section IV, we consider how § 506(f) might be interpreted so as to avoid this constitutional problem. In brief, we conclude that in order to harmonize the statute with the requirements of the Constitution, the Administrator should provide to Congress only budget information and legislative comments that have been approved by the Administrator's superiors, including, where appropriate, the President, OMB, and the Secretary.

## I. Background

The Airport and Airway Improvement Act of 1982 (AAIA) was enacted as Title V of the Tax Equity and Fiscal Responsibility Act of 1982. Pub. L. No. 97–248, 96 Stat. 324, 677 (1982). The AAIA generally authorizes an extension of, and enacts certain changes to, the Federal Airport Aid Program. In addition, § 506(f) provides:

> (f) TRANSMITTAL OF BUDGET ESTIMATES.—Whenever the Administrator of the Federal Aviation Administration submits or transmits any budget estimate, budget request, supplemental budget estimate, or other budget information, legislative recommendation, or comment on legislation to the Secretary, the President of the United States, or to the Office of Management and

Budget pertaining to funds authorized in subsection (a) or (b) of this section, it shall concurrently transmit a copy thereof to the Speaker of the House of Representatives, the Committees on Public Works and Transportation and Appropriations of the House of Representatives, the President of the Senate, and the Committees on Commerce, Science, and Transportation and Appropriations of the Senate.

In essence, this provision purports to direct the Administrator to report concurrently to Congress any budget data or legislative comments that are transmitted to the President, the Secretary, or OMB. By the terms of § 506(f), this requirement applies to budget information or legislative comments "pertaining to funds authorized in subsection (a) or (b) of this section . . . ." Subsections (a) and (b) authorize funding for acquiring or establishing and improving air navigation facilities and for establishing demonstration projects in connection with certain research and development activities. In addition, § 504(b) requires the Administrator to prepare and submit to Congress "a national airways system plan" and directs that the preparation be "subject to the requirements of section 506(f). . . ."

Given this statutory language, it is arguable that the Administrator is required to submit the specified reports, information, and comments directly to Congress prior to any review or approval by the President, the Secretary, or OMB. If the statute were read to impose such a requirement, the Administrator would be severed from his superiors in the Executive Branch with respect to these matters and would, in effect, become an independent agency reporting to both Congress and the President. In addition, the internal deliberative process within the Executive Branch would be tapped by an information pipeline running directly to a coordinate branch of government. These possibilities raise serious separation of powers issues, which are discussed below.

## II. Applicable Separation of Powers Principles

Article II, § 1 of the United States Constitution begins with the statement that "[t]he executive Power shall be vested in a President of the United States of America." Article II, § 3 requires the President to "take Care that the Laws be faithfully executed . . .," and also requires the President to "recommend to [Congress'] Consideration such Measures as he shall judge necessary and expedient. . . ." These constitutional provisions, taken together, impose certain fundamental duties upon the President and grant the power to direct the Executive Branch to carry out those duties.

In order to execute the laws adopted by Congress, the President must have the assistance of subordinate officials who will carry out his policies and implement his instructions with respect to the execution of law. The Supreme Court has, from its earliest decisions, consistently recognized this basic principle. For example, in *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 164 (1803), Chief Justice Marshall stated:

634

By the Constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion.

Although it is clear that the Constitution does not contemplate "a complete division of authority between the three branches," *Nixon* v. *Administrator of General Services,* 433 U.S. 425, 443 (1977), each branch retains certain core prerogatives upon which the other branches may not transgress. *See Buckley* v. *Valeo,* 424 U.S. 1 (1976). In *Buckley,* the Court recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," but it emphasized that there was a "common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." 424 U.S. at 120–21. The Court declared that it "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." 424 U.S. at 123.

The extent of the President's right to control subordinate officers was specifically considered by the Supreme Court in a trilogy of cases involving the President's power to remove federal officials. In *Myers* v. *United States,* 272 U.S. 52 (1926), the Court ruled unconstitutional a statute that limited the President's power to remove certain postmasters, and it declared, in *dictum,* that the repealed Tenure of Office Act had been unconstitutional as well.[1] In reaching this conclusion, the Court considered a number of factors, including the constitutional debates, previous congressional practice, and the relationship between the power to appoint and the power to remove. In addition, the Court expressly based its decision on the conclusion that "Article II grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed. . . ." 272 U.S. at 163–64. The Court based this conclusion on the following analysis of the President's control over subordinate officials:

---

[1] The Tenure of Office Act, 14 Stat. 430 (1867), had provided that all officers appointed by and with the consent of the Senate should hold their offices until their successors had been appointed and approved, and that certain heads of departments, including the Secretary of War, should hold their offices during the term of the President who appointed them, subject to removal by consent of the Senate. This Act was the principal basis for the articles of impeachment filed against President Andrew Johnson after he dismissed his Secretary of War without the consent of the Senate

The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone. Laws are often passed with specific provision for the adoption of regulations by a department or bureau head to make the law workable and effective. The ability and judgment manifested by the official thus empowered, as well as his energy and stimulation of his subordinates, are subjects which the President must consider and supervise in his administrative control. Finding such officers to be negligent and inefficient, the President should have the power to remove them.

272 U.S. at 135.

The Court confirmed this view of the President's power over his subordinates within the Executive Branch in *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935). In that case, the Court ruled that Congress could, consistent with the Constitution, immunize a Commissioner of the Federal Trade Commission (FTC) from removal by the President at his pleasure. The Court reasoned that the FTC could not "be characterized as an arm or eye of the executive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." 295 U.S. at 628. *Myers* was distinguished on the ground that "[t]he actual decision in the *Myers* case finds support in the theory that such an officer is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is." 295 U.S. at 627. The Court emphasized that within the Executive Branch, the President retained the right to direct the actions of his subordinates free from interference by another branch:

The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality. The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.

295 U.S. at 629–30. Thus, by narrowing *Myers* to cover only subordinates of the President within the Executive Branch, the Court linked the removal power even more clearly to the right of the President to control purely executive officials.

636

This principle was reaffirmed in *Wiener* v. *United States*, 357 U.S. 349 (1958). In that case, the Court held that the President did not have a constitutional right to remove a member of the War Claims Commission. The Court ruled that the Commission was essentially judicial in nature and that it was intended by Congress to operate entirely free of the President's control. 357 U.S. at 355–56. The Court expressly linked the right of removal with the right of the President to control a particular official:

> If, as one must take for granted, the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, *a fortiori* must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

357 U.S. at 356. The Court thus emphasized that *Humphrey's Executor* "drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers," and those who were members of an independent body required to exercise its judgment without hindrance from the Executive. 357 U.S. at 353.

These three cases clearly establish the President's right to control the actions and duties of his subordinates within the Executive Branch. *Myers* explicitly set forth the President's right to control as one of the bases for establishing the presidential right to discharge subordinate officials. *Humphrey's Executor* and *Wiener,* while limiting the President's removal power, reinforced the link between the President's right to control and his right to remove Executive Branch officials.

The President's right to control the execution of the laws free from undue interference from coordinate branches of government is supported by an additional line of authority. In *United States* v. *Nixon,* 418 U.S. 683 (1974), the Supreme Court confirmed that the Constitution protects the integrity of the Executive Branch decisionmaking process from interference by another branch through demands for information about the Executive's deliberations. The Court recognized

> the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.

418 U.S. at 705 (footnote omitted). The Court specifically acknowledged that this right of confidentiality "can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and

privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional under-pinnings." 418 U.S. at 705–06 (footnote omitted). The Court further noted that this protection "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." 418 U.S. at 708 (footnote omitted).

This decision gives further content to the principle that the constitutional separation of powers requires the President to have effective control over the decisionmaking process within the Executive Branch. The constitutional pre-rogative recognized by the Court connects the President's constitutional respon-sibility to take care that the laws be faithfully executed with the practical need for confidentiality in Executive Branch deliberations. The Court has unmistakably declared that the powers necessary to the implementation of the President's authority over the Executive Branch cannot be abridged absent a compelling and specific need asserted by another branch.[2]

The D.C. Circuit has explicitly recognized the right of the President to protect himself from unwarranted intrusions by Congress into the domain of protected decisionmaking activity. In *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (*en banc*), the court ruled that *the President was not required to produce to Congress certain transcripts of White House conversations.* The court decided that the general presumption in favor of the confidentiality of executive deliberations could be overcome "only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations. . . ." 498 F.2d at 730. The court found that the general oversight need of Congress in this instance was not sufficient to meet the court's requirement that the information be "demonstrably critical to the responsible fulfillment of the Committee's functions." 498 F.2d at 731.

The decisions and the long practical history concerning the right of the President to protect his control over the Executive Branch are based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitu-tionally assigned responsibilities. The executive power resides in the President,

---

[2] Although the *Nixon* case dealt with communications between the President and White House advisors, it seems clear that the principles enunciated therein extend at least to other important decisionmakers within the Executive Branch. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121 (D.C. Cir 1977). The *Nixon* Court specifically referred not simply to the President but to "high government officials and those who advise and assist them. . . ." 418 U.S. at 705 Furthermore, as the Supreme Court recognized in *Barr* v. *Matteo*, 360 U.S. 564 (1959), where it extended the privilege against libel suits involving official utterances to executive officials below Cabinet rank:

> We do not think that the principle announced in *Vilas* can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy

360 U.S. at 572–73 (footnotes omitted)

and he is obligated to "take care that the laws are faithfully executed." In order to fulfill these responsibilities, the President must be able to rely upon the faithful service of subordinate officials. To the extent that Congress or the courts interfere with the President's right to control or receive effective service from his subordinates within the Executive Branch, those other branches limit the ability of the President to perform his constitutional function. Therefore, only the most compelling and specifically supported needs will justify any interference with the President's power within the Executive Branch.

## III. Application of Separation of Powers Principles to § 506(f)

In this instance, the potential impact of § 506(f) on the Executive Branch is significant and adverse. On the other hand, the provision does not reflect any particularized congressional need for specific factual information. Under these circumstances, as described more fully below, the constitutionally based need to protect the executive process from a non-compelling intrusion by Congress suggests that the statutory provision should be very narrowly construed so as not to offend separation of powers principles.

### A. *Interference with the Executive Process*

There is no doubt that the Administrator is a purely executive official who serves at the pleasure of the President and is subject to the President's control. The FAA, as a division of the Department of Transportation, is indisputably an executive agency. The Administrator is appointed by the President with the advice and consent of the Senate, and he serves at the pleasure of the President. 49 U.S.C. § 1652(e)(1). The Administrator reports directly to the Secretary of Transportation, who reports in turn to the President. 49 U.S.C. § 1652(e)(3). Since the Administrator is a purely executive official subject to the direct control of the President, under the principles set forth above, the Administrator must be responsible to the Secretary, and ultimately to the President, and the Administrator's superiors have the right to supervise and approve the Administrator's work.

The concurrent reporting provision could be construed to interfere greatly with the President's right to supervise the Administrator's action. The provision could be read to require the Administrator to submit any budget information or legislative comments directly to Congress prior to any approval or even review by the Administrator's superiors, including the Secretary and the President. If the provision were interpreted in that manner, the Administrator would be effectively severed from his superiors in the Executive Branch with respect to these areas of his responsibility. On these vital budget and legislative matters, the Administrator would become, in effect, an independent agency reporting both to Congress and to the President. This concurrent responsibility is entirely inconsistent with the separation of powers principles set forth above and with the

639

corollary right of the President to control his subordinates within the Executive Branch.

The practical effect of a broad interpretation of § 506(f) would severely impair the President's ability to carry out his constitutionally assigned responsibilities. The President's responsibility to take care that the laws are faithfully executed includes the responsibility imposed by the Budget and Accounting Act to present a unified national budget to Congress. *See* 31 U.S.C. § 11. In order to implement this statutory responsibility, the President has established a budget development and review process through OMB, which is a part of the Executive Office of the President. The President through OMB requires that

> the confidential nature of agency submissions, requests, recommendations, supporting materials and similar communications should be maintained, since these documents are an integral part of the decisionmaking process by which the President resolves budget issues and develops recommendations to the Congress. . . . Budgetary material should not be disclosed in any form prior to transmittal by the President of the material to which it pertains. The head of each agency is responsible for preventing premature disclosures of this budgetary information.

OMB Circular No. A–10 (Nov. 12, 1976) at 2. Thus, the Executive has explicitly determined that disclosure of unreviewed recommendations by subordinates within the Executive Branch would adversely affect the President's ability to carry out his responsibilities.[3]

Moreover, the President has an explicit constitutional obligation to "recommend to [Congress'] Consideration such Measures as he shall judge necessary and expedient. . . ." Article II, § 3. The Administrator is responsible for making recommendations to the President concerning such legislative action so that the President may review them and determine which measures "he shall judge necessary and expedient." *Id.* Congress seeks to interdict this process by requiring immediate reporting of such legislative recommendations prior to the President's review or approval. Thus, although the Constitution gives to the President the right to present legislative recommendations on behalf of the Executive Branch, Congress, by this concurrent reporting provision, purports to require a subordinate executive official to present legislative recommendations of his own. Such a provision clearly transgresses upon the President's constitutionally designated role.

Thus, the concurrent reporting provision presents a constitutional problem that transcends the issue of executive privilege.[4] The issue here concerns not just

---

[3] Although Congress has enacted concurrent reporting provisions with respect to certain independent agencies, we are unaware that it has ever imposed a concurrent reporting requirement upon a purely executive agency that is under the President's direct supervision and control *See* 7 U S C § 4a(h)(1) (Commodity Futures Trading Commission); 15 U.S.C. § 2076(k)(1) (Consumer Product Safety Commission); 31 U.S.C § 11(j) (Interstate Commerce Commission).

[4] The provision would present a more classic executive privilege problem if it required production of recommendations and deliberative documents after the final budget decisions had already been made and transmitted to Congress by the President. That type of statute would present constitutional problems, but they would be of a different character tharr the ones presented by § 506(f).

protection of the deliberative process once a final decision has already been made, but rather protection of the President's ability to supervise the actions of his subordinate officials while the decisionmaking process is still going on. Because § 506(f) might be read to require a presidential subordinate to report both to Congress and his superiors within the Executive Branch, it intrudes deeply into the President's constitutional prerogative. Indeed, as thus construed, it would interdict and therefore irreparably damage, if not destroy, the normal exchange of views between agency heads and the President (through OMB) before budget submissions are finally approved. A potential result is that the Administrator might be cut out of the process and made into a figurehead with the budget work assigned to someone not subject to the constraints of § 506(f).

This Office has previously considered, and found constitutionally defective, legislative proposals that impose concurrent reporting requirements upon executive officials. For example, this Office has published an opinion concerning a proposal that an inspector general be required to report information directly to Congress, without review or approval by the head of the particular agency involved. *Inspector General Legislation,* 1 Op. O.L.C. 16 (1977).[5] In that opinion, this Office determined that the "President's power of control extends to the entire executive branch, and includes the right to coordinate and supervise all replies and comments from the executive branch to Congress." *Id.* at 17. The opinion stated that the requirement to provide information directly to Congress without Executive Branch clearance was "inconsistent with [the Inspector General's] status as an officer in the executive branch, reporting to and under the general supervision of the head of the agency." *Id.* In conclusion, the opinion set forth the following principle:

> Reports of problems encountered and suggestions for remedial legislation may be required of the agencies in question, but those reports must come to Congress from the statutory head of the agency, who must reserve the power of supervision over the contents of these reports.

*Id.* at 18.

## B. Congressional Need for § 506(f)

In the face of this significant interference with the President's right to control his subordinates, there does not appear from the legislation or its history a strong comparable Legislative Branch interest. Congress has not expressed a specific need for § 506, either in the statute itself or in the legislative history. One can only infer that Congress adopted the provision in order to obtain more information to assist it in carrying out its review of the budget. There is no indication that Congress could not obtain similar information to aid its deliberations from other sources or by other means that would be less intrusive upon the Executive Branch. Certainly there is no indication that the material "is demonstrably

---

[5] *See also Proposals Regarding an Independent Attorney General,* 1 O L. C. 75 (1977)

critical to the responsible fulfillment of the Committee's functions." *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d at 731.

Moreover, the concurrent reporting provision is a blanket requirement that applies to all budget information and legislative comments. The provision is sweeping and indiscriminate in its demand for information from the Executive Branch. This type of requirement is inconsistent with the Constitution's "spirit of dynamic compromise" with respect to disputes between coordinate branches of government. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). That case involved a Justice Department suit to block a congressional subpoena of third-party materials on the ground that production would pose a threat to national security. In resolving the clash between the Executive and Legislative Branches, the Court insisted on further efforts by the two branches to reach a compromise arrangement and emphasized that

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutitonal scheme.

567 F.2d at 130. By enacting a blanket statutory mechanism that would require automatic submission to Congress of preliminary and not fully developed Executive Branch positions, Congress has ignored this common sense construction of constitutional principles. Congress' need is much less significant than would be the case if Congress had made a specific, well-defined request for materials that were necessary for it to fulfill a vital legislative function. Congress may still make such a specific request, and it needs no statute to do so. Congress and its committees frequently obtain information in this manner from the Executive Branch when, in the view of the Executive Branch, the provision of such information will not have an unacceptable impact on the deliberative process.

On balance, if the concurrent reporting provision were construed to require immediate transmission to Congress of the Administrator's budget and legislative recommendations, it would violate the constitutionally prescribed separation of powers. The potential interference with the President's constitutional duty to supervise the actions of his subordinates would be substantial, while there does not appear to be any congressional need of comparable magnitude for the information. Therefore, the provision must be construed in a manner consistent with the separation of powers required under the Constitution.

### IV. Implementation of § 506(f)

In implementing § 506(f), the Administrator must act in accordance with the constitutional principles set forth above. Therefore, § 506(f) must be carried out

in a manner that will permit the Secretary and, as necessary, the President or OMB to review the Administrator's reports prior to their submission to Congress.

Broadly worded statutes that could be interpreted in such a way as to create a conflict with the separation of powers have, in the past, been interpreted very narrowly so as not to impinge upon the constitutional prerogatives of the Executive Branch. For example, Congress has enacted a provision that on its face requires any executive agency to submit to the Government Operations Committees of the House or Senate "any information requested of it relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954. This provision, however, has been narrowly interpreted by the Executive Branch to grant to the pertinent committees access to only the type of information that has traditionally been made available to Congress and that is not subject to valid claims of executive privilege. Statement of Attorney General Elliot Richardson, June 1973. Attorney General Rogers adopted a similar approach in response to a provision of the Mutual Security Act of 1954 in order to avoid a construction of the statute that would require production of documents presumptively protected by executive privilege. See 41 Op. Att'y Gen. 507, 525 (1960). This practice is, of course, consistent with the familiar rule that courts will adopt an interpretation of a statute that will avoid constitutional questions. See, e.g., United States v. Rumely, 345 U.S. 41, 45 (1953).

In this instance, we have concluded that § 506(f) can and should be construed to be consistent with the Constitution by interpreting the budget information and legislative comments that the Administrator is required to produce to Congress to include only "final" information and comments. In other words, until budget information, legislative comments, or any other material required to be transmitted to Congress is reviewed and approved by the appropriate senior officials, the material should be regarded as tentative, rather than final, conclusions of the Administrator. The information or comments would not become final until the appropriate review process was complete, at which time the Administrator, pursuant to § 506(f), would transmit the final information or comments to both the Secretary and Congress.

## V. Conclusion

In conclusion, we believe that § 506(f) is constitutional only if interpreted to permit the Secretary and the President to review the Administrator's reports prior to the time that they are submitted to Congress. We recommend that the Administrator carry out his responsibilities under § 506 in accordance with this constitutional requirement.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*