# Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request

The President may lawfully assert executive privilege in response to congressional subpoenas seeking communications within the Executive Office of the President or between the Environmental Protection Agency and the EOP concerning EPA's promulgation of a regulation revising national ambient air quality standards for ozone or EPA's decision to deny a petition by California for a waiver from federal preemption to enable it to regulate greenhouse gas emissions from motor vehicles.

June 19, 2008

THE PRESIDENT
    THE WHITE HOUSE

Dear Mr. President:

You have asked for my legal advice as to whether you may assert executive privilege with respect to documents subpoenaed by the Committee on Oversight and Government Reform (the "Committee") of the House of Representatives. The Committee has issued three subpoenas, two directed to the Administrator of the Environmental Protection Agency ("EPA") and one to the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget ("OIRA"), a component of the Executive Office of the President ("EOP"). The subpoena to OIRA and one of the subpoenas to EPA seek documents related to EPA's promulgation of a regulation revising national ambient air quality standards ("NAAQS") for ozone on March 12, 2008. The other subpoena directed to EPA seeks documents reflecting communications between EPA and the EOP concerning the agency's decision to deny a petition by California for a waiver from federal preemption to enable it to regulate greenhouse gas emissions from motor vehicles.

The Office of Legal Counsel of the Department of Justice has reviewed the documents that EPA and OIRA have identified as responsive to the subpoenas but have not provided to the Committee. The great majority of these documents are internal to EOP and were generated in the course of advising and assisting you with respect to your consideration of EPA's proposed ozone regulation. The great majority of the EOP documents are internal OIRA deliberative work product in support of your participation in the ozone decision. The remaining OIRA documents consist of deliberative communications between OIRA and others within the EOP, including White House staff. The EPA documents include unredacted copies of notices for meetings between EPA officials and senior White House staff to discuss the ozone regulation and California waiver decisions; redacted copies of the notices that are being produced to the Committee indicate the time and place of the meetings, but the identities of the meeting participants are redacted. The only other EPA document concerning the ozone regulation is a set of talking points for

1

the EPA Administrator to use in a meeting with you. The remaining EPA documents consist of talking points for EPA officials to use in presentations to senior White House staff at meetings at which California's waiver petition was discussed, communications within EPA and with EOP staff concerning the preparation of talking points for you to use in a conversation with the Governor of California, communications with EOP staff regarding how to respond to a letter to you from the Governor, and a response to a request from senior White House staff for a report on EPA's goals and priorities.

The Office of Legal Counsel is satisfied that the subpoenaed documents fall within the scope of executive privilege. For the reasons discussed below, I agree with that determination and conclude that you may properly assert executive privilege in response to the subpoenas.

## I.

Documents generated for the purpose of assisting the President in making a decision are protected by the doctrine of executive privilege. *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997) (addressing presidential communications component of executive privilege); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 1–2 (1999) (opinion of Attorney General Janet Reno) (same). As the Supreme Court recognized in *United States v. Nixon*, 418 U.S. 683 (1974), there is a

> necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These . . . considerations justify[] a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Id.* at 708.

The doctrine of executive privilege also encompasses Executive Branch deliberative communications that do not implicate presidential decisionmaking. As the Supreme Court has explained, the privilege recognizes "the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties." *Nixon*, 418 U.S. at 705. Based on this principle, the Justice Department—under administrations of both political parties—has concluded repeatedly that the privilege may be invoked to protect Executive Branch deliberations against congressional subpoenas. *See, e.g.*, *Assertion of Executive Privilege With Respect to Prosecutorial*

*Documents*, 25 Op. O.L.C. 1, 2 (2001) (opinion of Attorney General John D. Ashcroft) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. at 2 (explaining that executive privilege extends to deliberative communications within the Executive Branch); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 30 (1981) (opinion of Attorney General William French Smith) (assertion of executive privilege to protect deliberative materials held by the Department of Interior).[1]

The subpoenaed documents implicate both the presidential communications and deliberative process components of executive privilege. The EPA Administrator's talking points regarding the ozone regulation were provided for your use and are thus subject to the presidential communications component of the privilege. The OIRA documents fall within the scope of the presidential communications component because they are deliberative documents generated by your staff in reviewing a proposed agency regulation on your behalf and developing a position for presentation to you. Among other things, the OIRA documents contain candid assessments of alternative actions that EPA or you could pursue. Addressing the subpoenaed documents in their entirety, I believe that publicly releasing these deliberative materials to the Committee could inhibit the candor of future deliberations among the President's staff in the EOP and deliberative communications between the EOP and Executive Branch agencies, particularly deliberations concerning politically charged issues. As the Supreme Court explained, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. Accordingly, I conclude that the subpoenaed materials at issue here fall squarely within the scope of executive privilege.

## II.

Under controlling case law, a congressional committee may overcome an assertion of executive privilege only if it establishes that the subpoenaed documents are

---

[1] The Justice Department's long-standing position finds strong support in various court decisions recognizing that the deliberative process privilege protects internal government deliberations from disclosure in civil litigation. *See, e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) ("Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."); *Landry v. FDIC*, 204 F.3d 1125, 1135–36 (D.C. Cir. 2000) (describing how agencies may assert the "deliberative process" component of executive privilege in litigation); *Dow Jones & Co., Inc. v. Dep't of Justice*, 917 F.2d 571, 573–74 (D.C. Cir. 1990) (describing the "'deliberative process' or 'executive' privilege" as an "ancient privilege . . . predicated on the recognition that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl") (internal quotation marks omitted).

"demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). Those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution"). In particular, a congressional committee must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Senate Select Comm.*, 498 F.3d at 733. I do not believe that the Committee has satisfied this high standard with respect to the subpoenaed documents.

In assessing the Committee's need for the subpoenaed documents, the degree to which the Committee's stated legislative interest has been, or may be, accommodated through non-privileged sources is highly relevant. *See id*. at 732–33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources); *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977) (explaining that each branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3–4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony").

With respect to the ozone standards, the Committee asserts that it needs the subpoenaed materials to understand why the White House rejected EPA's "recommendations regarding the ozone standard" and to determine whether White House staff complied with the Clean Air Act when evaluating EPA's proposed regulation. Letter for Stephen L. Johnson, Administrator, EPA, from Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform at 2 (May 16, 2008). The Committee offers similar justifications in support of its demand for materials related to the California waiver issue. *See, e.g.*, Letter for Stephen L. Johnson, Administrator, EPA, from Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform at 1 (Dec. 20, 2007) ("Your decision appears to have ignored the evidence before the agency and the requirements of the Clean Air Act.").

The Committee's claim that it must have the subpoenaed materials to understand the reasons for EPA's decision on the ozone regulation is unconvincing given the substantial information already available to the Committee. To date, EPA and OIRA have produced or made available to the Committee approximately 30,000 pages of documents related to the revised ozone NAAQS standard. *See, e.g.*, Memorandum for the Members of the Committee on Oversight and Government Reform, from the Majority Staff of the Committee on Oversight and Government Reform, *Re: Supplemental Information on the Ozone NAAQS* at 1

(May 20, 2008) (30,000 pages of documents received from EPA and the Office of Management and Budget); *see also* Letter for Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform, from Jeffrey A. Rosen, General Counsel, Office of Management and Budget at 1 (May 20, 2008) (OIRA provided the Committee with access to more than 7,558 pages of documents). In particular, EPA and OIRA produced to the Committee copies of all communications between the Administrator of OIRA and the Administrator of EPA concerning the ozone NAAQS regulation. These communications explain in considerable detail the views of OIRA, EPA, the White House, and the President concerning the ozone NAAQS standard. *See, e.g.*, Letter for Stephen L. Johnson, Administrator, EPA, from Susan E. Dudley, Administrator, OIRA at 1 (Mar. 12, 2008) (describing disagreements between OIRA and EPA and advising EPA of the President's decision). Moreover, EPA publicly disclosed the substance of these concerns in the preamble to its Federal Register notice for the final ozone regulation. Finally, the Administrators of both EPA and OIRA testified before the Committee on May 20, 2008, concerning the ozone regulation. At that hearing, the Committee had ample opportunity to explore with the witnesses the decisions and rationale for the regulation.

It is of particular importance in considering the Committee's need for the internal OIRA documents—which constitute the great bulk of the documents at issue—that when the Administrator of OIRA testified before the Committee on May 20, the Committee had the opportunity to ask her about OIRA's role, as well as that of you and the White House staff, in the process leading up to the issuance of final NAAQS ozone regulation. Yet, the Committee asked no such questions. Indeed, Administrator Dudley was asked only four questions during the entire hearing. None of the questions put to the Administrator related to OIRA's internal deliberations or communications with the White House, and none demonstrated a need for additional documents or information from OIRA. *See* Letter for Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform, from Jeffrey A. Rosen, General Counsel, Office of Management and Budget at 2 (June 18, 2008).

EPA made similar accommodations with respect to the California waiver decision. The agency has made available to the Committee approximately 27,000 pages of documents concerning the decision. *See* Memorandum for the Members of the Committee on Oversight and Government Reform, from the Majority Staff of the Committee on Oversight and Government Reform, *Re: EPA's Denial of the California Waiver* at 1 (May 19, 2008). Again, these materials describe in considerable detail—as a memorandum prepared by Committee Staff demonstrates—the reasons behind EPA's decision to deny California's petition. Beyond receiving access to tens of thousands of pages of documents, the Committee also "deposed or interviewed eight key officials from the EPA" concerning the California waiver decision, *id.* at 1, and, as discussed above, the Committee had an

opportunity to explore the California waiver decision with the EPA Administrator at the public hearing on May 20.

OIRA's and EPA's efforts represent an extraordinary attempt to accommodate the Committee's interest in understanding why EPA denied California's waiver petition, why EPA issued the revised NAAQS for ozone, and the involvement of you and your staff in both decisions. Given the overwhelming amount of material and information already provided to the Committee, it is difficult to understand how the subpoenaed information serves any legitimate legislative need. In any event, when I balance the Committee's attenuated legislative interest in the subpoenaed documents against the Executive Branch's strong interest in protecting their confidentiality, I conclude that the Committee has not established that the subpoenaed documents are "demonstrably critical to the responsible fulfillment" of the Committee's legitimate legislative functions. *Senate Select Comm.*, 498 F.2d at 731.

## III.

For these reasons, I conclude that you may properly assert executive privilege in response to the Committee's subpoenas.

MICHAEL B. MUKASEY
*Attorney General*